UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA MOORE,

        Plaintiff,          Hon. Ellen S. Carmody

v.

                                          Case No. 1:11-cv-1052

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## **OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On January 12, 2012, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #10).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

1

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

2

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 44 years old on her alleged disability onset date. (Tr. 154). She completed the tenth grade and worked previously as a customer service representative and bindery worker. (Tr. 17, 20-21). Plaintiff applied for benefits on December 10, 2008, alleging that she had been disabled since January 15, 2008, due to arthritis, back pain, leg pain, knee pain, and thoracic outlet syndrome. (Tr. 154-62, 181). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 87-153). On January 19, 2010, Plaintiff appeared before ALJ Toni White-Bogan, with testimony being offered by Plaintiff and vocational expert, Rich Riedl. (Tr. 32-77). In a written decision dated June 18, 2010, the ALJ determined that Plaintiff was not disabled. (Tr. 13-22). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated the appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

**RELEVANT MEDICAL HISTORY**

In 2006, Plaintiff underwent bilateral rib removal to treat thoracic outlet syndrome.[1] (Tr. 267).

On January 3, 2007, Plaintiff was examined by Dr. Robert Schaefer. (Tr. 261-62). Plaintiff reported that she was experiencing "pain in both knees with the left being more severe than the right." (Tr. 261). An examination revealed that Plaintiff was experiencing "osteoarthritis of the knees, left more symptomatic than the right." (Tr. 261-62). X-rays of Plaintiff's left hip, taken on February 26, 2007, were "essentially normal." (Tr. 259). X-rays of Plaintiff's lumbosacral spine, taken the same day, revealed "mild degenerative changes [throughout] lower thoracic and lumbar spine." (Tr. 259-60).

On April 13, 2007, Plaintiff was examined by Dr. Irwin Estrine. (Tr. 253). An examination revealed "a positive Tinel's sign[2] is demonstrated at both wrists with right median nerve sensory deficit and diminished grip in the patient's dominant right hand as well as a positive Phalen's test[3] bilaterally suggestive of early carpal tunnel syndrome." (Tr. 253).

Treatment notes dated May 7, 2007, reveal that Plaintiff was suffering "advanced bicompartmental osteoarthritis involving the patellofemoral joint and medial compartment and complete loss of the articular cartilage in the femoral trochlear groove" of the left knee. (Tr. 252).

---

[1] Thoracic outlet syndrome is "a condition whereby symptoms are produced from compression of nerves or blood vessels, or both, because of an inadequate passageway through an area (thoracic outlet) between the base of the neck and the armpit." *See* Thoracic Outlet Syndrome, available at http://www.medicinenet.com/thoracic_outlet_syndrome/article.htm (last visited on March 21, 2013).

[2] Tinel's test (or Tinel's sign) is performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on March 20, 2013). Tinel's test is performed by tapping over the carpal tunnel area of the wrist with the palm up. A positive test causes tingling or paresthesia, and sometimes even a "shock type sensation," in the median nerve distribution. *Id.*

[3] Phalen's test is also performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on March 20, 2013). Phalen's test is performed by bending the patient's wrists downwards as far as they will comfortably go and pushing the backs of the hands together. The patient should hold this position for one minute. A positive test is indicated by numbness or tingling along the median nerve distribution. *Id.*

Dr. Schaefer observed that Plaintiff "is really struggling" and "is ready to proceed with a total knee arthroplasty." (Tr. 252).

On December 3, 2007, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed: (1) diffusely bulging disc osteophyte complexes[4] at C4-C5 and C5-C6; and (2) cervical spondylosis. (Tr. 277). X-rays of Plaintiff's left hand and right knee, taken the same day, were "normal." (Tr. 277-78).

Treatment notes dated December 13, 2007, indicate that Plaintiff experienced "excellent clinical result" as a result of her left knee surgery, but was still experiencing osteoarthritis in her right knee. (Tr. 251).

X-rays of Plaintiff's lumbosacral spine, taken January 11, 2008, revealed "mild degenerative changes." (Tr. 282). On February 4, 2008, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "no gross abnormalities." (Tr. 281).

On May 6, 2008, Plaintiff participated in a nerve conduction study the results of which were "abnormal" with "evidence of bilateral median mononeuropathy at the wrist," but "no evidence of suggestion of any other mononeuropathy, radiculopathy, plexopathy, myopathy or peripheral polyneuropathy." (Tr. 264-67).

On May 23, 2008, Plaintiff was examined by Dr. Schaefer. (Tr. 249-50). Plaintiff reported that she was continuing to experience "bilateral lower extremity pain, back pain, neck pain and shoulder pain." (Tr. 249). The results of a physical examination revealed the following:

> Examination of the lower extremities reveals pain-free range of motion of the hips. The right knee demonstrates crepitation

---

[4] Disc osteophyte complex occurs when "more than one spinal vertebra or intervertebral disc is affected by osteophytes," also known as bone spurs. *See* Understanding Disc Osteophyte Complex, available at http://www.laserspineinstitute.com/back_problems/spinal_bone_spurs/disc_complex/ (last visited on March 20, 2013).

5

> throughout the range of motion. There is no limitation with [range of motion] measured at 0 to 140°. Mild to moderate medial and lateral joint line tenderness, but no instability to the cruciate or collateral ligaments. The left knee demonstrates a well-healed anterior incision. No induration or erythema. No effusion. There is excellent range of motion at 0 to 125°. The knee is stable. There is no hypersensitivity or instability in examining this knee. Lisa has a negative straight leg raise in both the right and left leg in both the sitting and supine position. Muscle strength is symmetrical in both lower extremities. Examination of the upper extremities reveals full range of motion of the shoulders, elbows and wrists. No gross weakness is noted.

(Tr. 249).

The doctor diagnosed Plaintiff with the following: (1) status post left total knee arthroplasty with excellent range of motion and stability; (2) osteoarthritis, right knee; (3) chronic back pain, possibly with some radicular symptoms, but negative MRI; and (4) history of upper extremity paresthesias, possibly related to carpal tunnel syndrome or a result of thoracic outlet syndrome. (Tr. 249).

X-rays of Plaintiff's knees, taken on May 23, 2008 revealed the following:

> Evidence of a left knee prosthesis, in good alignment. No periprosthetic fracture or lucency identified. No convincing joint effusion on the left side. On the right side, mild medial joint compartmental narrowing. Mild patellofemoral marginal osteophyte formation. No convincing joint effusion. Findings likely represent mild changes of osteoarthritis.

(Tr. 280).

On January 11, 2009, Plaintiff participated in a consultive examination conducted by Dr. Edward Westerbeke. (Tr. 287-91). Plaintiff reported that she was experiencing lower back pain which radiated into her lower extremities. (Tr. 287). Plaintiff reported that she "can sit for about an hour, stand for 15 minutes, walks to her mailbox and back to her house and has pain." (Tr.

6

287). Plaintiff reported that she can "drive short distances" and "carry [one] gallon of milk and lift a grocery bag." (Tr. 287). Plaintiff walked with a "slight limp." (Tr. 288). An examination of Plaintiff's cervical spine revealed pain and tenderness. (Tr. 288). An examination of Plaintiff's shoulders revealed "tenderness over the rotator cuff." (Tr. 288). Phalen's test was positive upon examination of Plaintiff's upper extremities. (Tr. 288). An examination of Plaintiff's dorsolumbar spine was unremarkable and straight leg raising was negative. (Tr. 288). The doctor concluded that Plaintiff could lift/carry 20 pounds and could perform a "sit-down job which did not require her to stand excessively." (Tr. 288-89). Dr. Westerbeke further conceded, however, that he "did not see any of the reports on [Plaintiff's] back or knee x-rays." (Tr. 289).

On March 23, 2009, Plaintiff participated in an MRI examination of her left shoulder the results of which were "compatible with inferior glenohumeral ligament tear." (Tr. 359). X-rays of Plaintiff's left hand, taken the same day, revealed:

> An old avulsion fracture off the ulnar styloid is noted. No acute fractures of dislocations are seen. Mild degenerative changes of the first carpometacarpal joint space are seen with small osteophyte formation and joint space narrowing.

(Tr. 363).

On April 6, 2009, Plaintiff participated in an MRI examination of her right knee the results of which revealed "evidence of a mild to moderate knee joint effusion," but "no evidence of ligamentous or meniscal tear." (Tr. 360). The results of an MRI examination of Plaintiff's lumbar spine, performed the same day, were "normal." (Tr. 361). X-rays of Plaintiff's left shoulder, taken April 23, 2009, revealed "degenerative changes of the glenohumeral joint space," but "no acute left shoulder bony abnormalities." (Tr. 358). On August 27, 2009, Plaintiff participated in an MRI examination of her right shoulder, the results of which revealed:

7

> The rotator cuff and biceps tendons are intact. The glenoid labra are intact. The marrow signal intensity is within normal limits. There is marrow signal intensity in the infraspinatus muscle. This is probably related to vascular structures. No joint effusion is identified.

(Tr. 375).

On September 10, 2009, Plaintiff underwent "right knee arthroscopic synovectomy (major)" surgery on her right knee performed by Dr. Kurt Piatkowski. (Tr. 335-36). On October 13, 2009, Plaintiff participated in a bone mineral density examination the results of which were "within normal limits." (Tr. 357). X-rays of Plaintiff's left hip, taken on October 26, 2009, revealed "no significant osseous, joint or soft tissue abnormalities." (Tr. 356).

On November 5, 2009, Plaintiff was examined by Dr. Piatkowski. (Tr. 381). Plaintiff reported that she was still experiencing "persistent right knee pain." (Tr. 381). The doctor reported that the results of a physical examination were "unchanged." (Tr. 381). The doctor diagnosed Plaintiff with: (1) right knee chondromalacia patella; (2) right knee osteoarthritis; and (3) right knee synovitis. (Tr. 381).

Treatment notes, dated January 7, 2010, indicate that Plaintiff was suffering "left shoulder impingement syndrome." (Tr. 387).

On February 4, 2010, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed: (1) cervical spondylosis with foraminal narrowing and a relative central canal stenosis at C4-C5; and (2) diffusely bulging disc at C4-C5 and to a lesser extent at C5-C6 effacing the ventral thecal sac and ventral cervical cord. (Tr. 430-31).

On February 11, 2010, Plaintiff was examined by Dr. Piatkowski. (Tr. 433). Plaintiff reported that she was continuing to experience left shoulder pain. (Tr. 433). The doctor reported that a recent injection in Plaintiff's shoulder "did not provide her any comfort" and she continues

to suffer left shoulder impingement syndrome. (Tr. 433).

On October 4, 2010, Plaintiff was examined by Dr. Schaefer. (Tr. 479-80). Plaintiff reported that she was experiencing "chronic left shoulder pain and chronic right knee pain as well as new found right shoulder pain." (Tr. 479). X-rays of Plaintiff's right shoulder, revealed "mild/early degenerative bony changes involving the inferior glenoid fossa." (Tr. 481). The results of an examination revealed the following:

> Examination of the left shoulder demonstrates that she still has slight decrease in range of motion and a painful arc of motion. She has tenderness along the acromioclavicular joint and the anterior tip of the acromion at the insertion of the supraspinatus on the humeral head. There is a positive Hawkin's-Kennedy,[5] impingement sign and positive empty can maneuver.[6] Strength is 5/5, however, distal pulses 2+, sensation is intact distally. She still has 5/5 strength with resisted movement in all directions. Examination of the right shoulder demonstrates that she has tenderness to palpation along the anterior tip of the acromion, on the. . .supraspinatus on the humoral head and also along the acromioclavicular joint. She has limited active range of motion because of increased pain. Painful arc of motion 90° of forward flexion and abduction. Strength is 5/5 with resisted movements in all directions. Pain is associated with Hawkin's-Kennedy and impingement sign as well as empty can maneuver, however, strength is 5/5. Distal pulses 2+, sensation is intact distally. Examination of the right knee reveals generalized effusion. No ecchymosis, no redness or warmth to the skin. She has full extension to 120° of flexion. There is negative ligamentous laxity of the cruciate and collateral ligaments. There is both medial and lateral joint line tenderness. There is patellofemoral crepitus noted throughout the range of motion. Distal pulses 2+, sensation is intact distally.

(Tr. 479). The doctor further noted that Plaintiff "was very stressed during the examination today

---

[5] The Hawkin's Test assesses possible rotator cuff impingement. *See* Hawkin's Test, available at http://sitemaker.umich.edu/fm_musculoskeletal_shoulder/hawkin_s_test (last visited on March 20, 2013).

[6] The empty can test is used to assess for the presence of injury/pathology to the supraspinatus. *See* Shoulder - Empty Can Test, available at http://orthoassessment.blogspot.com/2007/01/shoulder-empty-can-test.html (last visited on March 20, 2013).

9

and crying frequently." (Tr. 479).

At the administrative hearing, Plaintiff testified that she "occasionally" drives a vehicle, but only drives "very short distances" because if she drives "too long of a distance, then [her] hands will go numb, and [she] won't hardly be able to walk when I get out of the vehicle." (Tr. 39). Plaintiff reported that she "can write, but only for a couple of minutes, because my hands go numb." (Tr. 40). Plaintiff reported that she is unable to work "because it's just too much pain on me with my knees and my shoulders, and, you know, the severe headaches that I wake up with." (Tr. 41). With respect to her daily activities, Plaintiff testified that:

> I get up, and it takes me a few hours to get moving. I have to take my medication. And then, I watch a little TV, I read a little bit, and have my lunch. And, you know, I pretty much sit down, take a little break; get back up, just kind of move about the house a little; try to read a little; keep my mind busy; watch TV again. And that's pretty much how my day goes every day.

(Tr. 42). When asked about meal preparation, Plaintiff testified that "I just make myself a little snack or pop a little meal in the microwave." (Tr. 42). Plaintiff also testified that she experiences "a very hard time" dressing and caring for herself because of her inability to "raise [her] right arm." (Tr. 42-43). Plaintiff reported that she can stand/walk for approximately 5-10 minutes after which she will begin to experience "stabbing pains" that force her off of her feet. (Tr. 50). Plaintiff also reported that she experiences knee pain when arising from a sitting position. (Tr. 50-51). Plaintiff reported that she can sit for approximately 30 minutes before she needs to get up. (Tr. 55). Plaintiff testified that she can lift or carry "about five pounds occasionally." (Tr. 55-56).

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating

disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[7] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

---

[7]1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

The ALJ determined that Plaintiff suffered from osteoarthritis and depression, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 15-17). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she requires a sit/stand option; (2) she can occasionally balance, stoop, kneel, crouch, and climb stairs, but can never climb ladders; (3) she must avoid heat, cold, vibration, unprotected heights, and hazards such as machinery and moving mechanical parts; (4) she cannot use her left upper extremity to perform overhead reaching activities; (5) she can occasionally use her upper extremities to perform fingering or feeling activities; (6) she can frequently use her hands to perform reaching and handling activities; and (7) she experiences moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (Tr. 17).

The ALJ concluded that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on ther issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). Ther standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Rich Riedl.

The vocational expert testified that there existed approximately 1,500 jobs in the state of Michigan, and approximately 50,000 nationally, which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 67-72). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

        a.      The ALJ's Assessment of Plaintiff's Subjective Allegations is not Supported by Substantial Evidence

At the administrative hearing, Plaintiff testified that her impairments were significantly more limiting than recognized by the ALJ's RFC determination. The ALJ, however, discounted Plaintiff's subjective allegations on the ground that such "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 19). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20

13

C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such

14

evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

Nevertheless, "blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Minor v. Commissioner of Social Security*, 2013 WL 264348 at *16 (6th Cir., Jan. 24, 2013). Furthermore, the ALJ must "consider all objective medical evidence in the record, including medical signs and laboratory findings, where such evidence is produced by acceptable medical sources." *Id.*

In support of her decision to discount Plaintiff's subjective allegations, the ALJ concluded that "the medical records discussed above do not provide for the level of severity alleged by the claimant." (Tr. 19). The ALJ, however, offered no discussion, explanation, or elaboration as to why the medical records "discussed above" called into question Plaintiff's subjective allegations. Moreover, any such rationale is not immediately apparent when reviewing this evidence as such is not necessarily inconsistent with Plaintiff's subjective allegations.

The ALJ did, however, subsequently identify and discuss a separate item from the medical record in support of her decision to discredit Plaintiff's subjective allegations, the January 9, 2009 consultive examination conducted by Dr. Westerbeke. The ALJ's reliance on this item is unpersuasive. First, Dr. Westerbeke examined Plaintiff on only one occasion and, as previous noted, the doctor acknowledged that he did not even have access to Plaintiff's complete medical records. Given Plaintiff's various impairments, this is not an insignificant omission. More significantly, as

15

the medical evidence makes clear, Plaintiff's impairments and limitations significantly worsened following Dr. Westerbeke's January 2009 examination.

In support of her decision to discredit Plaintiff's subjective allegations, the ALJ also cited to certain aspects of Plaintiff's reported activities. Specifically, the ALJ noted that Plaintiff alleged that the stiffness in her lower extremities "is relieved by extending her legs." (Tr. 19). This assertion hardly undermines the credibility of Plaintiff's subjective allegations. The ALJ noted that Plaintiff testified that she "still drives for short distances." (Tr. 19). Again, it is not apparent (and the ALJ did not explain) how this comment calls into doubt Plaintiff's credibility. Moreover, the ALJ neglected to put this particular statement in context. While Plaintiff acknowledged that she drives for short distances, she further testified that if she drives "too long of a distance, then [her] hands will go numb, and [she] won't hardly be able to walk when I get out of the vehicle." (Tr. 39). Again, this statement hardly constitutes evidence calling into question Plaintiff's credibility. The ALJ also noted that Plaintiff conceded that she is able to perform very limited, and very light, household and personal activities. (Tr. 19). The ALJ fails to explain, and it is hardly self-evident, how Plaintiff's testimony that her ability to function is severely limited undermines her credibility.

In sum, the ALJ's evaluation of Plaintiff's credibility rests primarily on a "blanket assertion" that Plaintiff is not credible. To the extent that the ALJ discussed and analyzed the record to support her conclusion, such efforts suffer from two glaring errors: (1) the ALJ did not consider all (or even a significant portion) of the record evidence, and (2) the evidence upon which the ALJ expressly relied does not even support her conclusion. Accordingly, the ALJ's articulated rationale for discrediting Plaintiff's subjective allegations is not supported by substantial evidence.

As detailed above, the ALJ assessed Plaintiff's residual functional capacity and

16

concluded that Plaintiff retains the ability to perform a limited range of sedentary work. The ALJ's RFC determination, however, is premised on her unsupported evaluation of Plaintiff's credibility. Moreover, Plaintiff's subjective allegations enjoy significant support in the record. Accordingly, the Court finds that the ALJ's RFC determination is not supported by substantial evidence.

The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite her limitations. However, the ALJ's RFC determination is not supported by substantial evidence. Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision is not supported by substantial evidence, there does not exist *compelling* evidence that Plaintiff is disabled. Evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The Court concludes, therefore, that the Commissioner's decision must be reversed and this matter remanded for further factual findings.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.

Date: March 22, 2013                                       /s/ Ellen S. Carmody
                                                           ELLEN S. CARMODY
                                                           United States Magistrate Judge